Let me remind counsel that the panel will not interrupt your argument for the first three minutes. Ordinarily, something may come up. So you'll have the three minutes to get going. Then we'll start asking questions. Mr. Lane, are you ready to proceed? I am, Your Honor. Thank you. Okay, please do so. Well, good morning, Your Honors. May it please the court. I am Sean Lane, and I'm here today representing former Sheriff Brian Norton and former Deputies Gary Bruder and Jesse Hand and Deputy Jonathan Hart, who are the appellants in this matter. I would like to reserve three minutes for rebuttal, if possible. Your Honors, appellants come before you today seeking relief from the district court's order granting partial summary judgment on their behalf, but denying summary judgment on two issues. First, the questions that we are presenting to this court today are whether Appley's 42 U.S.C. 1983 claim against Bruder, Hart, and Hand brought for an alleged Eighth Amendment violation for inadequate medical care, while Appley was incarcerated in the Rio Grande County Jail, can proceed to trial on Appley's theory of negligence in properly monitoring him while he was incarcerated in an observation cell, or whether the appellants are entitled to qualified immunity on that claim. Second, we're asking whether the district court erred in allowing plaintiff's sole state law claim for negligence to proceed against appellants Bruder, Hart, and Hand in their official capacities only when those individuals are entitled to qualified immunity for their alleged actions and therefore protected under the Colorado Governmental Immunity Act. Ultimately, Your Honors, we are asking this court to dismiss this matter in its entirety. Your Honors, Appley was arrested in Creed, Colorado on arson charges on November 17th of 2015, and he was taken to the Mineral County Jail, which is a really small facility. Mineral County decided they wanted to transfer the Appley to the Rio Grande County Jail, which is larger and better equipped, and because of their more extensive facility, they wanted to move him there. So in order to do this, they needed to have Appley medically cleared before the Rio Grande County Jail would accept him. So, Appley was checked by a mental health clinician in Mineral County who reported that there were others, and thereafter the Appley was approved to be moved to the Rio Grande County Jail, and he was moved there. Once there, the plaintiff began displaying strange behaviors, and his behavior reached a level where he was doing things that were upsetting other inmates to the point where jail staff felt he needed to be moved to his own cell for his own safety from the other inmates. At this point, jail deputies believed that he was acting strange and definitely had strange behavior, but that he didn't pose a threat to anyone, including himself. So, he was moved into an observation and booking cell, so it was located in the booking area, and there he was in the presence of sheriff's deputies 24 hours a day, with short breaks when deputies were sometimes called upon to deliver medications to jail inmates. Counsel, this is Judge Hart. What about the district court's ruling that there was sufficient evidence to find that the defendants were not checking on Mr. Sawyer? Well, in your honor, I appreciate you asking that, and one of the situations with that is that what the court, I believe, said was that there was very little evidence, but there was some evidence. In this matter, your honor, we continue to stress the fact that the testimony appears to be uncontested, and some evidence comes from these jail logs, but one thing I would like to raise is that even if he wasn't necessarily being checked by us, the strict 15 minutes, and we're not conceding that, but even if that were not happening, the fact is that there is no, he was being watched, and I don't think, I think that the judge's order actually does agree with that, but the question is how often does he need to be watched, and with, under the qualified immunity doctrine, it appears to us that even if he was only seen every 20 minutes, or even if we, you know, grant the plaintiff's position. Let me interrupt you, counsel. We don't have jurisdiction to review findings, or, I shouldn't say findings, we don't have jurisdiction to review the district court's determination that there was sufficient evidence that they were not attentive. Your honor. We don't do that on an interlocutory appeal. So you say, even though we're not conceding that, but you have to concede it for purposes of this appeal. And certainly, and we certainly can concede that, and one of the things I wanted to get to was to say that even conceding that fact, under the doctrine of qualified immunity. But that is conceding. Yes, yes, your honor. No, no, I want to know, you seem to say, well, we can see that they were checking every 15 minutes, but maybe every 20 minutes. That's at least how I understood you. What, what? Well, I mean, and I apologize for that, your honor. I would say that even conceding the plaintiff's position that there could have been three-hour breaks, and I believe that's their position, I believe that these officers would still be covered under the doctrine of qualified immunity. Even if they weren't checking every three, even though they went three hours at a time without checking? Yes, your honor. I believe that that would be the case. Because if you look at, one, at the burden that plaintiff has to bear with respect to qualified immunity, our research has not indicated that there's any specific time frame for observation that these officers were expected to observe the, I believe. There's no guideline passed by the court stating that they have to monitor every 20 minutes to be in compliance, or every four hours to be in compliance. Judge Matheson, did you have a question? I have a question. Oh, I'm sorry. Go ahead, Judge Matheson. Go ahead. I'm still thinking of mine. Okay. I have a question. So, the sheriff ordered the deputies to observe the plaintiff every 15 minutes, right? Well, your honor, the policy for Suicide Watch was that he would be monitored every 15 minutes. Okay. I mean, that's, we're just, I don't want to get into a semantics debate with you. Had the sheriff ordered everybody to watch him every, to look at him every 15 minutes? Your honors, the sheriff specifically ordered these deputies to write down any strange behavior by the appellee, and their policy required that if he was on Suicide Watch, he be monitored every 15 minutes. Okay. Was he on Suicide Watch? There is some question with respect to that. I think that it isn't really addressed specifically in the order. There certainly was at least one night where we believe he was on Suicide Watch, but in any case, we have consistently argued, and we believe the record reflects the fact that he was monitored in this booking cell almost all the time, except when the Right. Okay. So, I mean, assuming, so we know, you agree with me, it seems that at least part of the time he was designated in such a way where they were supposed to, by policy, check him every 15 minutes. Correct. Agree on that? Yes, your honor. Okay. And to the extent there is either some ambiguity or difference of opinion as to whether at other times he was supposed to be looked in on every 15 minutes, I mean, we have to look at that in a light most favorable to the district court's decision, don't we? Yes, you do, your honor. Okay. Yes, I think it's factual. And so that just brings us full circle to the idea that the deputies were supposed to, I mean, at least in the world we're living in today, they were supposed to look at him every 15 minutes. And then you have the log where it showed that sometimes they, there's no question they were checking him every 15 minutes, right? The log does reflect that, yes, your honor. Okay. And I guess my question is, isn't it fair for the district court to look at the inferred from the absence of the time entries on this log that he wasn't checked every 15 minutes? And doesn't that bring us to the position that the deputies were violating some type of order or policy? I think that taking those facts in the light most favorable to the appellee, yes, but we still believe that qualified immunity would apply here. One, because first there has to be established a constitutional violation. Second, of course, that there has to be, the officers have to be put on notice of a clearly established law that prohibits their behavior. And we believe that on the first prong of that test plaintiff, or excuse me, appellee fails. And though this is argued in the brief, we believe that, you know, that the eighth amendment liability, it requires more than an ordinary lack of due care for a prisoner's interest or safety. Counsel, this is Judge Hart. Being told to check somebody who's clearly mentally deranged at the time, every 15 minutes, and then not checking for three hours at a time, that's not negligent. That's extraordinary, is it not? It may not be true. There's a question as to, I'm sorry, Your Honor. I said that may not be true, but we have to accept those facts. So that would be extraordinary indifference, would it not? Your Honor, I think what we have to look at here is the entirety of the record. And I would believe, you know, in the record what we have is that these deputies continue to call, and it's not these specific deputies, but jail staff in general, for assistance from San Luis Valley Mental Health. And when they call the mental health facility, mental health clinicians, professionals, would come out to the jail and repeat, and this is a theme in this case, and repeatedly tell jail staff that this, Diaboli, this prisoner, was not a danger to himself or others. In fact, in the days leading up to him harming himself, he was seen no less than three times. Counsel, excuse me for interrupting, but you've touched on something that I had a question about. This is the danger to himself question relating to deliberate indifference. Could you explain why the defendants didn't know he was a danger to himself when, number one, they're monitoring him every 15 minutes. Number two, he had a self-inflicted nose injury on November 28. There was evidence that they put a belly cuff on him so he couldn't injure himself, and that he pulled back his toenails. And the log itself, at the very top, says suicide watch. Now, taking those facts, why wouldn't it be reasonable for the district court to infer that the defendants knew he was a danger to himself? To some extent, that requires the deputies to make a diagnosis on their own, Your Honor. They did recognize that there were issues, and they kept calling for professional help. The professionals would either come or the appellee would be taken to them on a couple of occasions. They would always assure these deputies that the appellee was not a danger. And they would keep bringing him back. I listed a number of things, but let's just talk about what's on the log. The officers are filling out a log, and the headline on the log is suicide watch. Isn't that, by definition, an indication that the individual is a danger to himself? Well, Your Honor, the suicide watch log was an artifact of a previous administration. Well, it's in the record, though, and it's the log that the officers were filling out. It seems now we're getting back to Judge Hart's point about arguing factual issues. Well, this is an issue where the document itself was not filled out by all deputies. There was no requirement within their policies to keep any kind of a written record. But this suicide watch log is kind of a notepad that exists within the computer in the booking area. The deputies would use for different purposes, one of which was to write down observations. Counsel, why isn't this a jury argument? Well, to some extent, I mean, I take it back to the fact that even given what plaintiffs are saying and conceding all the facts to their position, we would say that they have not borne their burden under qualified immunity by, one, establishing the deliberate indifference to a serious medical need, and two, by showing prior case law that would put these officers on notice. Counsel, your time has expired. Are there any other questions by the panel? Judge Matheson, did you have something more? No, thank you. Judge Carson? No, nothing further for me. Thank you. Thank you. Okay. Ms. Chalupka, are you ready to begin? I am. Please, you start. Members of the bench, if it pleases the court, my name is Maren Lynn Chalupka. I'm from Scotts Bluff, Nebraska, and together with my co-counsel, Jeffrey Hill, I represent Greg Sawyers. We thank you, your honors, for hearing argument in this case, and we ask this court to affirm the judgment at the district court for two reasons. Number one, the district court found that there were genuine issues of material fact, meaning that there is no final appealable question for purposes of Title 28 of the United States Code, Section 1291. And number two, even if this court does exercise jurisdiction, the district court's findings of genuine issues of material fact was correct. Not every claim that touches on qualified immunity is available to a defendant on interlocutory appeal. In 1995, the United States Supreme Court held in the case of Johnson v. Jones that a defendant who's entitled to invoke qualified immunity cannot appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a genuine issue of fact for trial. This court would have jurisdiction over a claim that there was no violation of clearly established law accepting the facts as the district court viewed them, but this court does not have jurisdiction over a claim that the plaintiff has not presented enough evidence to prove that his version of the facts actually occurred. The defense has argued that Greg Sawyers didn't present enough evidence to support his constitutional claims, but that claim of insufficient evidence is a purely factual dispute. It does not turn on an issue of clearly established law. Judge Moore found genuine issues of material fact regarding whether the defendants abandoned Greg Sawyers when they were supposed to watch him. And because Judge Moore found material factual disputes that must be resolved by a jury, his court doesn't have jurisdiction to re-weigh the evidence in the record to decide whether material factual disputes preclude summary judgments. And what are those facts? Well, the facts are that Greg Sawyers clawed out his eyeball in a glass-paneled jail cell after two weeks of intensifying psychotic behaviors. And the defendants cannot agree on how that happened. Mr. Bruder says that Mr. Hart and Mr. Hand were seated just feet away with one of them actually with his back against the glass panel of Greg's cell, somehow not noticing that the inmate whom they're supposed to watch carefully is ripping his eye from its socket. Mr. Hart and Mr. Hand say they were on their feet, walking back into the booking area from someplace else in the cell or in the jail. None of these defendants can explain away the three-hour gap in the multiple logs in which they were supposed to mark their observations of Greg. And none of these defendants can explain why it is that video evidence that would tell us exactly what was going on was destroyed when the sheriff admittedly knew that litigation was inevitable. Counsel, this is Judge Hart. Yes. The best argument that defendants have is, regardless of whether this is sufficient evidence to establish deliberate indifference, there just isn't a case like this out there to establish, to constitute clearly established law. And they're not liable without that. How do you respond to that point? Well, I disagree. This is not an appeal about whether the right at issue was clearly established. It was. The 14th Amendment grants pretrial detainees a right to medical evaluation and treatment for their serious medical needs. And there is robust authority saying that that includes mental illness. And if the defendants did not watch Greg Sawyer's, they violated that right. The district courts, is there one that's exactly like this? Is there a case that says that you, that pertains exactly to the issue of a psychotic man auto-enucleating, which is the term for removing his own eye? There may not be. There will be after this one. But what's the best case you've got? What's the closest you can come in that regard? The closest that I can come? The closest that I can come? Oh my goodness. I apologize. Any other questions? Go ahead. We listed in our brief the case of Montoya. And Montoya, as the defense complained, was a case involving MRSA. But there are important similarities in the Montoya case. And those similarities include the amount of time that went by in which an inmate or a detainee's symptoms are intensifying and are getting worse. And the circumstantial evidence, not just the direct evidence, is that the symptoms are intensifying. And that the jail is well aware of that. Its employees are well aware of that. And they don't act while the symptoms get worse and worse. That's what happened here, Your Honor. And the Montoya case, it's not a mental illness case, but it does still have those components of intensifying symptoms. Now, objectively, what we have to show is that Greg Sawyer's... I just found... Can you still hear me, Your Honor? Yes. Okay. What we're required to show is that Greg Sawyer's medical condition really was serious. And there's not a reasonable question of fact on this. Now, objectively, there were multiple clinicians who warned the jail that Greg was very seriously mentally ill, warned him that his condition was likely to worsen. There's not a single clinical report that says his condition was resolving. And this is important, there's not a single clinician's order that removes Greg from the 15-minute suicide watches. Let me interrupt. Judge Matheson, do you have any questions? Well, just to follow up on the clearly established law question, the Montoya case was a district court case. And for clearly established law for qualified immunity, we look for a Supreme Court or a Tenth Circuit case. And given that it's your burden to show clearly established law, I didn't see a Supreme Court or Tenth Circuit case. Now, the district court, in its summary judgment decision, cited our decision in Garcia v. Salt Lake County. Would you like to address whether that case supplies clearly established law? I'll take the assist, Your Honor. The Garcia case is one in which this court has said that pre-trial detainees are entitled to protection against deliberate indifference of their serious medical needs. And had established that, that's the same protection from deliberate indifference as convicted inmates. And that is the basic framework in which we have to be analyzing. I understand that part of it, but how is it factually analogous to this case? I can't answer that question at this time, Your Honor. I apologize. Could I just ask one other thing? We have the three individual defendants and the district court in really the briefing tend to group them. But could you just zero in for a minute on Sgt. Bruder? Why was he deliberately indifferent compared to the other defendants? I can give you a couple of reasons for that, Your Honor. And it's not just the Monell supervisory issue that is involved. Being present that night, he was aware that... We start with his awareness. He certainly was aware of Greg's worsening condition. He had been directly involved in use of force with Greg earlier that day when Greg had attempted to escape from the cell. Now, that night, there was three... At that time, there's three people on duty. There's Mr. Bruder, Mr. Hart, and Mr. Hand. And as Mr. Bruder had said a number of times in his deposition, well, I was just around the corner. And yet, at the time that Hart and Hand left the area wherever they went, Mr. Bruder, who claims that he was watching diligently on the video screens the entire time, didn't come up to restaff that area, the booking area, excuse me. Even though he knew that in that booking area was an inmate who was on suicide watch. There's no order removing him. And he'd been told by his own sheriff and by mental health, watch this man carefully and document what he does. And as Sergeant Bruder says, we knew that this booking area is never to be left unstaffed, irrespective of whether there's a high-risk inmate there. And here, he allowed that policy violation to take place. He saw that they were leaving and said that... and allowed it to be unstaffed with a high-risk inmate sitting there. Now, what you may have noticed, Your Honor, is that there is this conflict between what Sergeant Bruder claims happened and what Mr. Hart and Mr. Hand claim happened. And they cannot all be telling the truth. They cannot. Mr. Bruder says that Hart and Hand were... had been back in the booking area for quite some time before they exclaimed that Greg had removed his eye. Hart and Hand disagree and say, well, we were just coming back into that booking area and happened to see it. They can't all be telling the truth. And so there's... you know, that creates questions of fact right there. Um, Bruder was... Counsel, um... Counsel. Sorry. Carson, do you have questions? I don't have any questions right now. Thank you. Proceed, Counsel. Okay. And as you'll see, although Sergeant Bruder was a supervisor, he was directly involved, as you'll see from the logs, in documenting observations. Um, this was a small facility. This was not like the, you know, the Denver County Jail. And even somebody who has a supervisory title, such as Sergeant, is going to be involved in the, you know, managerial inmate care, the ministerial part of that, on an ongoing basis. And that's why you'll see Sergeant Bruder's names on these logs as well. And so he had the same responsibility as did Hart and Hand to make sure that... that Greg was watched. He had the same responsibility for the fact that three hours passed. Three hours without any evidence that he was looked at at all. And it's not just that they didn't watch him, although what I would say about just watching him is that that was the easiest and most effortless thing that these three defendants could have done, and they didn't do it. The log is the fact. And every excuse that defendants make about marking that log for three hours is just another question of fact. And of course, again, we have video evidence that should have shown us what was going on, and it has been destroyed. And the law is very clear that defendants who have, you know, could have been shown by video evidence, they could not get to benefit from its destruction. Now, not only did they not watch him, they didn't just pick up the phone and call mental health, which would have been the next least effort thing that they could have done. A little more effort, get him out of the cell, take him to the hospital, which they had been told to do by clinicians, and they did not do that either. Which leads me to this question of what exactly did these three defendants do for Greg Sawyers on the night of December 2nd? Did they do anything? What the logs show and the absence of video evidence is that for three hours they did not take him to the hospital, didn't call a clinician. They didn't either engage with him or talk to him. They have to turn cartwheels to explain away evidence that says they didn't even watch him. One of your honors said, that's not negligence, that's extraordinary indifference. Deliberate indifference is when you don't care even a little bit. Just sitting there and watching an inmate as ordered would be that very bare minimum, especially, and this is important, on a night when the jail is half empty and there's no bookings, all of them admitted there was no reason they couldn't have done it and they didn't care enough to even do that. They knew there was a substantial risk of serious harm so obvious that a reasonable man would realize it and the fact is that they actually and subjectively did realize that risk. The district court found questions of material fact as to whether these defendants were deliberately indifferent to Greg Sawyers and for that reason this court should affirm the district court trial. If the court doesn't have any other questions I've concluded my argument and I appreciate again the opportunity to argue. Judge Matheson or Judge Carson any further questions? None here. Nothing here, thank you. Thank you. I think Mr. Lane's time has expired, is that correct Mr. Wyman? Yes it is your honors, time has expired. Okay, so this case is submitted please.